**AERODEX, INC., Appellant,**

v.

**AMERICAN INTERNATIONAL INSURANCE CO., S. A., Appellee.**

No. 17386.

United States Court of Appeals
Fifth Circuit.

April 1, 1959.

James Knight and Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, Fla., for appellant.

Paul L. E. Helliwell, John C. Whitehouse, Helliwell, Melrose & Sanderson, Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal from a judgment based on a jury verdict in favor of the Insurance Company as subrogee of its assured, Expreso Aereo Interamericano, S.A., raises two questions. The first is whether there was sufficient evidence to warrant the jury in finding that the cause of the damage to Expreso's plane, which made a crash landing at the Miami airport was the negligent installation by appellant of a wrong link rod in the overhaul of the right engine. The second is whether

the evidence demanded a directed verdict that the crash was caused either solely by negligence of Expreso, or, if not, that Expreso was contributorily negligent as a matter of law and should thus be denied recovery notwithstanding the negligence, if any, of Aerodex.

Evidence introduced on the trial would authorize the jury to believe: that Aerodex owned the motor in question; it overhauled and reconditioned it and sold it to Florida International Engine Service, Inc., which sold it to Expreso without significant alteration; the latter company installed it in its C46–A aircraft without alteration, repair or interference with the internal parts of the motor; it was put into service by Expreso for cargo flights between Miami and Havana, Cuba, on December 22, 1955; it made ten roundtrip flights from Cuba to Miami and return before the crash on January 10th. On the pilot's report on eight of the flights there was entered some adverse comment relative to the functioning of the right hand propellor or noticeably high oil temperature in this motor. The maintenance reports, which appear on the back of the pilot's reports, show that on five of them some corrective action had been taken; in some instances it appears that corrective action related to faults reported on more than the one report.[1]

The jury could also find that: on January 10, 1956, the airplane took off from the Miami airport and when between 150 and 175 feet altitude near the end of the runway, the right hand engine "froze"; the pilot feathered the propellor, tried momentarily to gain a little more altitude and got to an estimated 200 feet;

[1]. In view of appellant's contention that the continued flying of the airplane with a motor reported as giving trouble constituted negligence as a matter of law, we quote in full by dates of reports; first the pilot's "squawks," as they are known in the trade, and, second, the remedial action reported taken on the back of the same report. The numbers are the numbers carried on the printed report forms. Only comments on the motor assembly are included:

"1. # 780 12–22–55, Miami to Havana.
  1. Right battery out of order.
  2. Right engine oil temperature 100° C (high).
  3. Right propellor 2750–2800 RPM (at take-off).

"2. # 781 12–22–55
  2. Right engine oil temperature too high (95°–100°C).
  3. Small vibration on the right engine.
      Maintenance Report
  Right battery replaced [see # 780 above].
  Replaced right brake [This is included, although it probably relates to the running gear, not the motor assembly].

"3. # 782 12–23–55
  2. Right propellor 2850 RPM at take-off and oscillating while climbing.
  5. Fast vibration on right engine in cruise.

"4. # 783 12–27–55 (two roundtrips)
  1. Right oil temperature 95° inincline 102°.
  3. Right engine temperature 100/105° (high).
      Maintenance Report
  Adjusted right propellor governor. OK
  Inspected right oil screen. OK [see # 782 above].

"5. # 784 12–28–55
  No "squawks."
      Maintenance Report
  Repaired right generator.

"6. # 785 12–29–55
  1. Slight vibration on right engine.
  2. Back fires on right engine while on the ground, slight.

"7. # 786 1–4–56 [incorrectly dated 12–4–55].
  1. Right propellor out of synchronization in cruise.
  2. Right engine vibrates slightly.
      Maintenance Report
  Changed # 17 cylinder shield and also high tension lead on the right magneto, right engine. Daily inspection on both engines.

"8. # 787 1–5–56 [incorrectly dated 12–6–56]
  1. Right engine vibrating (this was reported the first day that the engine was installed). Please check it immediately.

"9. # 788 1–9–56
  1. Slight vibration on right engine.
      Maintenance Report
  "Replaced right engine carburetor."

the remaining engine began to overheat and the pilot determined that he could not gain sufficient altitude to continue on to prepare for a normal landing; he called the tower for permission to land, got a clearance for any runway, banked to the left and entered the approach to strip 35; thereupon he commenced lowering his landing gear, although he feared it was too late to get it down and locked before landing; he was warned by the tower that his landing gear was not down, but he continued his descent and landed on the strip; the landing gear retracted and he made a "belly landing"; he did not lower his landing gear until he had "made" the landing strip, because to do so would have caused him to lose altitude and stall.

A later inspection demonstrated, as testified to by appellant's former inspection superintendent, that the engine failure was attributed to "the installation of an R–2800–C series Link Rod in No. 9 cylinder," [2] whereas it should have been a B series rod.

Although the trial was conducted apparently on the theory that Aerodex was responsible for the faulty installation,[3] appellant now says there was no evidence that the faulty part was installed by it. A careful reading of the record demonstrates that there is no merit in the contention. It was testified by employees of the intervening owner that the motor was not tampered with by it and the maintenance reports of Expreso, admitted without objection by appellant, show the extent of work on this engine performed by Expreso. If this were not sufficient there are three other circumstances which the jury could consider as bearing on this issue.

After the former Aerodex superintendent Hatfield testified as to the care with which the repair work was done by

his company, Aerodex, he answered as follows:

Question by the Court: "How many inspectors did you have at that time?"

The witness: "About twenty-five, I suppose."

Question by counsel: "In your opinion it would be possible, in fact it was proven possible, that a 'C' series rod could be put in a 'B' series engine?"

The witness: "Yes, sir."

This is testimony given by the man who at the time of the alleged improper installation was supervisor of inspection for Aerodex and who later represented Aerodex at the tear down inspection and signed the report that engine failure was attributable to "the installation of an R–2800–C series Link Rod in No. 9 cylinder."

Moreover it was proved that after the crash, Expreso was given another engine by Florida International Engine Service, Inc., due to the failure under the warranty period, and that International in turn made a claim on Aerodex, which was satisfied by Aerodex giving a $3,000 credit to International. Upon cross examination of the International employee who testified to this, counsel for Aerodex asked:

"Were you fully satisfied by Aerodex because of the bad motor that you bought from Aerodex?"

It would hardly seem necessary for appellee to offer further proof that the motor was defective when sold by Aerodex in light of this characterization of it by counsel.

Again, there is the testimony of Hatfield, the representative of Aerodex, who,

2. This is shown on the Tear Down Inspection Report signed by Aerodex superintendent Hatfield.

3. For instance, its counsel in presenting a hypothetical question to one of appellant's witnesses after outlining the maintenance performed as shown in footnote 1, assumed that Expreso had not installed the rod. He said, "Now, on the day of the flight, on the day of the crash, the owner of this airplane had not performed any other maintenance on this engine."

when speaking of the tear down inspection, testified:

The Court:

"Do you say this engine you found to be defective on that day of inspection is a different engine than the one that went through your plant on which this file was built?"

The witness:

"The data plate showed a different serial number,[4] yet the cylinders *and internal parts*, if I remember correctly, matched the serial numbers of the engine we overhauled." (Emphasis added.)

 Clearly, there was ample evidence to permit the jury to find that the improper installation of the series C link rod in a series B motor was done by appellant. The proof made out a jury case within the principles originally announced in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696. See also Vrooman v. Beech Aircraft Corp., 10 Cir., 183 F.2d 479, and the recent decision of this Court in Hiern v. St. Paul-Mercury Indemnity Co., 5 Cir., 262 F.2d 526, and the Florida cases of Matthews v. Lawnlite Company, Fla., 88 So.2d 299, and Continental Copper & Steel Industries, Inc., v. E. C. "Red" Cornelius, Inc., Fla.App., 104 So.2d 40.

The remaining contentions of appellant relate to the alleged negligence of Expreso, first, in flying the plane when its pilots reported deficiencies respecting the motor, and second, in the conduct of the pilot in not more skillfully landing the plane in order to prevent its being damaged.

Although there was evidence touching on both of these issues from which the jury could have found negligence on the part of Expreso, we think it abundantly clear that such evidence was not of such a compelling nature as to invoke the rarely used power of the court to hold conduct of a party to be negligent as a matter of law. This is especially so with respect to the conduct of the pilot, who, having been suddenly faced with the loss of an engine while at 150 feet off the ground at near stalling speed, had to extricate himself and his crew as best he could. In such a situation this Court has said:

"In such cases as this, it is the law that one placed in a position of sudden emergency or peril by the negligence of another, and not by his own negligence, is not held to the same degree of care and prudence as one who has time for thought and reflection. Thus, if one finds himself in a position of sudden peril and acts as a person of ordinary prudence would act under such circumstances, the jury may find him free from negligence or contributory negligence, although he might have been able to avoid the accident under less pressing circumstances." Car & General Ins. Corp. v. Keal Driveway Co., 5 Cir., 132 F.2d 834, 836.

The judgment is affirmed.

---

4. Other evidence indicated that at the request of Expreso, International had changed the serial number.